## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN LATOUR,                          )
        Plaintiff,                  )
                                    )
        v.                          )
                                    )
STEPHEN MCCULLAR, MICHAEL             )          Civ. No. 13-1631
MCBRIDE, DAVID KINGSTON, JOHN         )
LAMANCUSA, ELLWOOD CITY               )
POLICE DEP'T, *and* BOROUGH OF        )
ELLWOOD CITY,                         )
        Defendants.                 )

## OPINION

CONTI, Chief District Judge

## I.  INTRODUCTION

This is a civil rights action filed by plaintiff John Latour ("Latour") under 42 U.S.C. § 1983. Latour alleges that local law enforcement officials violated his Fourth Amendment rights by (1) recklessly omitting material facts from a search warrant application for his business property to search for suspected illegal synthetic marijuana (the "property-based Fourth Amendment claim") and (2) seizing his person without legal justification pending the application for the search warrant (the "person-based Fourth Amendment claim"). Defendant Joshua Lamancusa ("Lamancusa"), the District Attorney of Lawrence County, Pennsylvania, is the only remaining defendant in this action. He filed a motion for summary judgment under Federal Rule of Civil Procedure 56. (ECF No. 62.)

Fully briefed, Lamancusa's motion is ripe for disposition.

The court will grant in part and deny in part Lamancusa's motion for summary judgment. Lamancusa's motion will be granted with respect to Latour's property-based Fourth Amendment claim. Genuine disputes of material fact, however, preclude the entry of summary judgment in favor of Lamancusa on Latour's person-based Fourth Amendment claim. His motion will be denied with respect to that claim.

## II. PROCEDURAL HISTORY

On November 14, 2013, Latour filed a complaint in this court against the Ellwood City Police Department, police officers David Kingston ("Officer Kingston") and Michael McBride ("Officer McBride"), civilian Stephen McCullar ("McCullar"), and Lamancusa. (ECF No. 1.)

On February 5, 2014, Latour filed an amended complaint replacing the Ellwood City Police Department with the Borough of Ellwood City ("Ellwood City") as a defendant.[1] (ECF No. 18.)

On April 7, 2014, Latour voluntarily dismissed McCullar from this action.[2] (ECF No. 31.)

On May 28, 2014, the court held a hearing at which it granted motions to

---

[1] On February 6, 2014, the Ellwood City Police Department was terminated as a defendant in this case.

[2] On April 8, 2014, McCullar was terminated as a defendant in this case.

dismiss Latour's first amended complaint filed by Ellwood City, Officer Kingston, Officer McBride, and Lamancusa. *See* (Text Minute Entry, 5/28/2014 (granting the motions to dismiss filed at ECF Nos. 19 and 21 and dismissing Latour's state law claims against all defendants with prejudice).)

On June 10, 2014, Latour filed a second amended complaint. (ECF No. 38.) On June 24, 2014, Lamancusa filed a motion to dismiss Latour's Fourth Amendment § 1983 claims against him. (ECF No. 41.) On August 13, 2014, the court held a hearing at which it denied Lamancusa's motion to dismiss. *See* (Text Minute Entry, 8/13/2014.) On August 25, 2014, Lamancusa filed an answer and affirmative defenses to Latour's Fourth Amendment § 1983 claims against him. (ECF No. 50.)

On May 4, 2015, the parties filed a stipulation dismissing Ellwood City, Officer Kingston, and Officer McBride from this lawsuit with prejudice (ECF No. 57), and on July 7, 2015, the court entered an order to that effect, leaving Lamancusa as the only defendant remaining in this action. *See* (ECF No. 60.)

On September 14, 2015, Lamancusa filed this Rule 56 motion for summary judgment, a supporting brief, and a concise statement of material facts with accompanying exhibits. (ECF Nos. 62–65.) On October 14, 2015, Latour filed a brief opposing Lamancusa's motion and a response to his statement of facts. (ECF Nos. 66, 67.) On October 28, 2015, Lamancusa filed a reply brief and responses to

Latour's statements of fact. (ECF Nos. 68, 69.) On November 4, 2015, Lamancusa filed a joint concise statement of material facts. (ECF No. 70.)

## III. FACTUAL BACKGROUND

### A. *Synthetic marijuana and Latour's business*

In general, the chemical makeup of synthetic marijuana varies; certain chemicals used to make it are illegal while others are legal. *See* (ECF No. 70 ¶ 9.) At all times relevant to this action, offsite laboratory testing was necessary to determine if synthetic marijuana contained illegal chemicals; field-test kits were unavailable, and illegal synthetic marijuana could not be visually distinguished from its legal variety. *See* (*id.* ¶¶ 13, 25, 38.)

Latour owned and operated My House Tobacco ("My House") in Ellwood City, Pennsylvania. (*Id.* ¶ 1.) My House sold tobacco, smoking products, and synthetic marijuana. (*Id.* ¶¶ 1–2.) The synthetic marijuana at issue in this case—which was recovered by law enforcement officials during a search of My House—was determined to be legal after offsite laboratory testing. *See* (*id.* ¶¶ 56, 58.)

### B. *The search warrant standing order and application process*

On March 17, 2010, the Lawrence County Court of Common Pleas issued a standing order (the "Standing Order"), which provided:

> [U]pon review of the foregoing Certification as filed by The District Attorney of Lawrence County, Pennsylvania pursuant to [Pennsylvania Rule of Criminal Procedure] 202, it is hereby ordered, that, effective March 17, 2010, search warrants, arising out of, or

4

involving violations of [Pennsylvania's Controlled Substance, Drug, Device and Cosmetic Act, 35 PA. CONS. STAT. § 780-101 *et seq.*] shall not hereafter be issued by any officer unless the search warrant application had the approval of an attorney for the Commonwealth.

(ECF No. 65-5 (capitalization omitted).)

A Lawrence County district attorney in office prior to Lamancusa filed the "Certification" referenced in the Standing Order. *See* (ECF No. 70 ¶ 32.) In other words, the Standing Order was "established by at least one" of Lamancusa's "predecessors," and it was "in existence before [Lamancusa] took office." (ECF No. 65-2 at 11.)

Lamancusa described the search warrant application process under the Standing Order as follows:

Typically, what occurs is the police will contact the [district attorney's] office and they'll tell us about whatever situation they've encountered or they are trying to pursue, whether it's a narcotics investigation or whether it's a patrol stop that necessitates a warrant. They will usually give us an overview over the phone saying, hey, here's what I got. And then we'll ask, you know, based upon their information, we'll ask some follow-up questions, and then they have to put it down in writing, and then sometimes they will fax it to our office. Or if, you know, if we're on site some place, then the prosecutor will then take a look at it, review it right then, and then it will be sent to a magistrate or a judge.

(*Id.* at 10–11.)

Concerning the input that prosecutors gave police officers in drafting narcotics-related warrant applications under the Standing Order, Lamancusa stated that

[police officers] never ask a prosecutor what to write.  Since we're not present during the [narcotics] buys, we don't provide them information on what to write.  If an officer tells us what they did, then we go through it, and then they will put it down on paper.  And then usually when we read it, you will correct—number one, you correct for grammar just because you're going to be presenting it to a magistrate or Court of Common Pleas judge, [and] you want it to look as professional as possible.

But you do address situations where if officers make some sort of legal conclusion in their statements, you go back and you get them to flesh that out . . . .  [For example,] an officer will state that, you know, he pulled a car/vehicle over, and the driver of the vehicle made furtive movements, and that's why he felt that in the interest of officer safety, he had to do a pat-down or a [*Terry*] frisk

Well, the statement of furtive movements, . . . that's a legal conclusion, that justifies his pat-down.  What we always ask the officers at that point is, okay.  Explain what you mean by furtive movements, and then the officer will say, well, he—you know, when I pulled the car over, I saw him dip down with his right shoulder and reach under the seat.  We say, okay.  That's what you need to write.  You need to write what you actually observed, not the conclusions as you're describing it.

That's the type of interaction we have with the officers.  But at no time will we tell them what to say.  That would be illegal.

. . .

[We would suggest that certain changes be made], but not regarding the facts . . . .

[U]ltimately, it's the officer who has to sign his name on it, so he's got to be able to be the one that's [*sic*] able to testify about what he put in the [a]ffidavit of [p]robable [c]ause.

(*Id.* at 12–13.)

Concerning whether he "ever [told]" a police officer whether he "believe[d]"

that an affidavit was "sufficient to support probable cause," Lamancusa stated:

> Absolutely. That's the whole purpose of the checkmark [on the warrant application signifying the district attorney's approval, in accordance with the Standing Order]. If I did not believe there was probable cause, then we would not sign off on the warrant [application].
>
> . . .
>
> If an officer gave me an application and said, here's what I got, and we reviewed it and we did not believe that it met the threshold, then we would not sign off on it. And, again, by sign off, I mean only our approval. It still has to go to the magistrate in order to get the search warrant or [to] the Court of Common Pleas judge.

(*Id.* at 13–14.)

## C.    *Officer McBride's first interactions with McCullar*

On the morning of August 10, 2012, Officer McBride spoke with local resident McCullar on the telephone. (ECF No. 70 ¶ 21.) McCullar stated that his son was in the hospital because he ingested synthetic marijuana that McCullar believed his son purchased from My House. (*Id.*) Officer McBride responded that he would consult with the district attorney's office because he was not "familiar" with the "ever-changing law" of "synthetic products." (ECF No. 65-4 at 7 ("Some [synthetic marijuana is] legal, some of it is not. It depends on what's in it.").) After speaking with McCullar, Officer McBride called and left a message with the district attorney's office to discuss the legality of synthetic marijuana. (ECF No. 70 ¶¶ 26, 27.)

Later that day, Officer McBride met with McCullar in person. (*Id.* ¶ 27.) At the meeting, McCullar gave Officer McBride a clear plastic bag that, McCullar claimed, contained synthetic marijuana McCullar purchased from My House. (*Id.* ¶ 28.) Officer McBride described the contents of the bag as "ground-up . . . brownish-greenish" "vegetable matter" that resembled, but did not smell like, marijuana. (ECF No. 65-4 at 8.)

### D. Officer McBride's first interactions with the district attorney's office

After meeting with McCullar, Officer McBride called the district attorney's office a second time and spoke with Diane Shaffer ("Shaffer"), an assistant district attorney. (ECF No. 70 ¶ 30.) Officer McBride told Shaffer about his interactions with McCullar. (*Id.*) In response, Shaffer faxed Officer McBride the "verbiage of the law" vis-à-vis synthetic marijuana. (ECF No. 65-4 at 8.) Shaffer advised Officer McBride to draft a search warrant application for My House based upon McCullar's alleged purchase of synthetic marijuana there. (ECF No. 70 ¶ 31.) She provided Officer McBride "some verbiage" to "use in the search warrant of what to be searched and seized." (*Id.*; ECF No. 65-4 at 8.) Officer McBride wrote an initial draft of the My House search warrant application and faxed it to Shaffer. (ECF No. 70 ¶ 33.)

Later in the day, Officer McBride again spoke with Shaffer on the telephone about the My House search warrant application. (*Id.* ¶ 35.) According to Officer

McBride, he also spoke with Lamancusa, who instructed him to conduct a "controlled buy" of synthetic marijuana from My House.  (*Id.*)  Officer McBride described his discussion with Lamancusa during the call as follows:

Q.	After you faxed a draft search warrant to [Shaffer], what happens next?

A.	I can't recall if [Shaffer] called me or I called her.  And I was speaking to her on the phone, and we were talking about the— she always goes over if there's [*sic*] any problems that she sees in the search warrant or if there's anything that needs to be changed, and she said, here, [Lamancusa] wants to talk to you. So, at that point, [Lamancusa] got on the phone with me.

	. . .

Q.	. . . Do you recall your conversation with [Lamancusa]?

A.	[Lamancusa] said he thinks that we should do a controlled purchase; that he thinks that it would make the case better; that he wants us to make a controlled purchase, which we've done before with narcotics investigations.  So, basically, he said do a controlled purchase.  At that point, I said, [Lamancusa], I'm going to have to talk to . . . my shift supervisor . . . because that's going to entail an overtime issue and calling guys out to do that.

Q.	When [Lamancusa] said he wanted to make the case better, did he explain at all to you what he meant by that?

A.	No.  All I can take it is [Lamancusa] wanted [to] . . . have policemen view the actual purchase from [My House] . . . .

Q.	. . . That's your speculation as to why [Lamancusa] wanted that?

A.	He just told me he wanted—I've worked for [Lamancusa] since he started there, and I know what he means by an undercover

drug buy. That's what he wants . . . . [A] buy for court is we conduct a controlled purchase of a narcotic. A controlled purchase is we bring an informant in, he's strip-searched, he's explained—he's given money to purchase a narcotic or product . . . . The benefit is that you have police officers doing surveillance on a location and . . . they can articulate that the individual actually purchased the product from a facility or the actual person, and that's more accurate in court and for crediting an informant's testimony.

. . .

Q. Other than speaking about the controlled purchase and asking your supervisor, was there anything else that you discussed with [Lamancusa] on that telephone call?

A. No. He wanted to speak with the shift supervisor because I explained to [Lamancusa], I can't make that call. I have to consult my boss.

. . .

Q. Do you know if [Lamancusa] spoke to [the supervisor]?

A. Yes, he did. Over the phone . . . . [Lamancusa] was explaining to [the supervisor] what he wanted done, and [the supervisor] said, okay. We'll do whatever you want us to do . . . . And then [the supervisor] advised me to go ahead and call guys out to do a controlled purchase of synthetic marijuana from My House [using McCullar].

(ECF No. 65-4 at 8–9.)[3]

---

[3] Lamancusa's account of his interaction with Officer McBride differs from Officer McBride's account. Lamancusa stated he was "back-briefed" at "some point in the afternoon" about the incident reported by McCullar:

I was told, hey, here's what had occurred, and here's what we are going to do, and that would have been by Officer McBride.

### E.    Preparation for and execution of the controlled purchase

After speaking with Shaffer and Lamancusa, Officer McBride called several other Ellwood City police officers and McCullar to the police station to prepare for the controlled purchase at My House.  (*Id.* at 9.)  When the officers and McCullar arrived, Officer McBride met with them in the "operations room," where the officers briefed McCullar on "what [they] wanted him to do" and gave him "the money" to purchase synthetic marijuana from My House.  (*Id.* at 10.)  "At some point," Lamancusa arrived at the police station, "looked at" Officer McBride's "paperwork that [he] had at the computer," and confirmed with Officer McBride that they "were going to wait until after . . . the [controlled] buy to finish the search warrant" application.  (*Id.*)  Officer McBride spoke with Lamancusa "[b]riefly"; Lamancusa "[knew] that [the officers had] done this before . . . [and] basically just sat there and said, we're going to make a controlled buy."  (*Id.*)

After the briefing, the officers drove to My House to conduct the controlled purchase of synthetic marijuana through McCullar.  (*Id.*)  According to Officer McBride, Lamancusa was present for the controlled buy in a police vehicle with

---

I can't give you the specific time and the contents.  I'm sure it was a, hey, you know, we had this event happen in Ellwood City where we want to do a controlled buy, or, you know, what do you want us to do?  You know, that type of thing.

(ECF No. 65-2 at 5–6.)

officer John Disher ("Officer Disher").[4]  (*Id.*)

As planned, McCullar purchased synthetic marijuana from Latour at My House and brought it to Officer Disher, who informed the other officers that "he had the product" in his possession.  (*Id.*)  After receiving notice from Officer Disher, Officer McBride and several other officers, including Officer Kingston, entered My House, while Officer Disher returned to the police station to "[take] a statement from [McCullar]."  (*Id.* at 11.)  After entering My House, Officer McBride spoke with Latour:

> I just advised [Latour] that we're going to be applying for a search warrant for the premises, that we made a purchase of synthetic marijuana.  And right away, [Latour] said, okay.  I sell it.  And he explained that it was legal what he was doing.
>
> And I advised him that I'm not familiar with the product, and that the [district attorney] requested us to do a purchase, and that we're going to be sending [Latour's] product to the lab, and that we were going to apply for a search warrant to search the premises for the product.

(*Id.*)  Officer Kingston stated that Officer McBride once inside My House "was speaking to [Latour] mainly," but Officer Kingston recalled telling Latour that

---

[4]  Concerning whether he was "present for the controlled buy" at My House, Lamancusa stated:

> I do not recall being present . . . .  It would be extraordinary for me to be present during a controlled buy . . . [b]ecause it's a police function . . . .  I offer no real aid to it.  I wouldn't be doing any surveillance[;]  I wouldn't be a confidential informant.  There would be no reason for me to be present.  In fact, I become more of a liability because then police officers have to worry about my safety, where I am, and I certainly don't want to be a witness either.

(ECF No. 65-2 at 6–7.)

"[they] were going to secure a search warrant for the premises." (ECF No. 65-3 at 4.)

According to Latour, Lamancusa entered My House after the controlled purchase and spoke to him directly:

> . . . [Lamancusa] walked into my store [after the controlled purchase], and he basically said—I said, the stuff, sir, I said—I didn't know who he was. I said, I don't know who you are, but the stuff I'm selling is legal, here's [*sic*] my reports.[5] He said, I don't really care about that. He said, this is a head shop, everything in here is illegal. He said, pack it up, and, basically speaking, Mr. Latour is to be retained [*sic*] until we get a search warrant, and if he gives you a hard time, put him in cuffs, and then he stormed out . . . .[6]

(ECF No. 65-1 at 7.)

### F. Officer McBride's drafting, and Lamancusa's approval, of the search warrant application

After speaking with Latour in My House, Officer McBride returned to the police station to finish drafting the warrant application:

> Officer Disher . . . and [Lamancusa] had went [*sic*] back to the station. I know [Officer] Disher took the statement from Mr. McCullar, which was provided. I took the statement, the information Officer Disher provided me, entered that into the search warrant [application]. Again, [Lamancusa] was there. He advised me—he helped me.

---

[5] Latour had a laboratory report supplied by each vendor for every "batch" of synthetic marijuana sold by that vendor reflecting that the product contained legal chemicals. (ECF No. 65-1 at 7.)

[6] Contradicting Latour's statement that Lamancusa entered My House after the controlled purchase, Officer McBride "believe[d]" that Lamancusa returned to the police station with Officer Disher after the controlled purchase. (ECF No. 65-4 at 11.)

. . . [Lamancusa is] an active [district attorney]. He wants to make sure that the case is good . . . . [H]e looked it over because he approves it. Again, I said, that's his policy. He approves the search warrants so I don't file something that's not approved by the [district attorney]. That's policy. He has an order out that we have to do that.

(ECF No. 65-4 at 11.)

The warrant application was signed by the affiant Officer McBride and described the basis for the requested search warrant in three paragraphs. In relevant part, the first paragraph stated:

> This Officer [*i.e.*, Officer McBride] has been employed as a patrolman with Ellwood City Police Department since October of 2002, 5 years of which I have been a K-9 handler. This Officer has received extensive training in narcotics identification, narcotics policing tactics and other related narcotics training, including indicia of use and/or identification of related contraband from [a variety of law enforcement sources] . . . . I have been an active member of the Lawrence County Drug Task Force since being employed by the New Castle Police Department in 2000. This Officer has been assigned to the Lawrence County District Attorney's Special Investigations Unit since 2011 . . . . This Officer has participated in numerous Countywide Drug Investigations and has personally observed many violations of the Controlled Substance, Drug, Device and [C]osmetic Act. Based upon my training and experience, I have become familiar with the methods employed by persons trafficking, possessing and using controlled substances.

(ECF No. 65-6.) The second paragraph stated:

> On 08/10/2012 at approximately 1425hrs this Officer was contacted at the Ellwood City Police Department by [McCullar]. [McCullar] advised that he just purchased synthetic marijuana at 1420hrs from [My House] . . . . He advised that there was only one person working at the time and he described him as a white male approximately 50 years of age, gray hair, 5'9 [*sic*], 180lbs [*sic*] wearing glasses. Mr. McCullar advised that his [*sic*] asked for the special blend or Bernys.

When he asked the white male he provided him with a small plastic baggie containing a green vegetable substance. The White Male retrieved the substance from behind the cash register in a box. He placed the Ten Dollars cash that [McCullar] handed him in the register. This Officer weighed the bag of suspected Synthetic Marijuana. It weighed approximately 1.26 grams.

(*Id.*) Finally, the third paragraph stated:

On 08/10/2012 at 1730hrs your affiant [Officer McBride] [and four other officers] met [McCullar] at the Ellwood City Police Department to make a controlled purchase of Synthetic Marijuana [from My House]. Your affiant searched . . . [McCullar] and cleared him of possessing any Controlled or Counterfeit Substances and US Currency. I issued him twenty dollars of recorded US Currency in denominations of two Fives and one ten. Officers conducted constant surveillance of [McCullar] as he walked [into My House] and back out. He handed Officer Disher the bag of MJ Burny 1g Aromatic Potpourri (AKA Synthetic Marijuana). Officers entered . . . My House . . . and advised the owner ([Latour]) who was the only occupant that were [*sic*] going to apply for a search warrant.

(*Id.*)

The warrant application listed the following items "to be searched and seized" from My House:

Synthetic Marijuana, Salvia, Divinorum and/or any other Synthetic Version of Marijuana or any Controlled or Counterfeit substance, Drug Paraphernalia as defined by [Pennsylvania law] . . . including any device used for weighing, scales, measuring, packaging, storing, ingesting, producing, cooking, . . . processing, preparing, repacking, storing, inhaling, smoking of illegal or illicit drugs, controlled substances into the body [*sic*]. Any device used for selling, giving, distributing or otherwise distributing controlled or counterfeit substances, namely, Synthetic Marijuana, Salvia, Divinorum and/or any other Synthetic Version of Marijuana to [*sic*].

United States Currency, money, books, records, receipts, marked

money, ledgers or other papers relating to the transportation, ordering, purchasing and distribution of a controlled or counterfeit substance. Owner, Occupant, Employee or Possessor information [*sic*] of the building and/or business.

(*Id.*)

The warrant application listed the following "violations" of "Title 35, P.S. Section 780-113":

(16) Possession of Controlled or Counterfeit Substance[.]
(30) Possession of Controlled or Counterfeit Substance with the intent to Deliver a Controlled or Counterfeit Substance.
(30) Delivery a [*sic*] Controlled or Counterfeit Substance[.]
(32) Possession of Drug Paraphernalia[.]

(*Id.*)

The fill-in box on the warrant application form specifying that it was "Approved by [the] District Attorney" was checked. (*Id.*)

Officer McBride discussed the process of drafting the warrant application as follows:

Q. Did you start drafting [the My House search warrant application] earlier in the day prior to the controlled buy?

A. Yes.

Q. And then you finished it after the buy; correct?

A. Correct.

Q. Can you tell me which portion you drafted prior to the buy?

A. Three paragraphs. The first paragraph was conducted before the buy. That is my training and experience portion portfolio.

The second paragraph was based off of Mr. McCullar's purchase on his own of the product. And the third paragraph was drafted after the controlled purchase.

Q.      Just so I'm clear, everything [in the first two paragraphs] was drafted before the controlled buy?

A.      Yes.

Q.      Did [Lamancusa] help you draft anything [in the first two paragraphs]?

A.      No. That was all what I was faxing to [Shaffer] to get approved for a search warrant prior.

        . . .

Q.      Did [Lamancusa] help you draft anything [in the third paragraph]?

A.      Yes. We talked. Again, it's short and sweet and to the point of what happened; so—there wasn't a whole lot of complex verbiage or anything that had to go into it. Just that he approved it, and I then went to [the magistrate].

Q.      Do you recall what you spoke to [Lamancusa] about this part?

        . . .

A.      He—again, [Lamancusa is] . . . a very active [district attorney]. He's a hands-on kind of guy. He—he just basically looked everything over, looked over the entire search warrant [application] all over again and said it was good, and I left. I checked the box at the top "warrant application approved [by the district attorney]," and I left.

Q.      When you say [Lamancusa] is very hands-on, can you explain to me what that means?

A.      Prior [district attorneys] didn't take an aggressive stance on

17

narcotics.    [Lamancusa] is very well-respected in our community for that.

. . .

Q.      . . . Did [Lamancusa] give you any language in this Affidavit?

A.      I can't recall.  Again, he was sitting there with me in the office.

. . .

Q.      Do you see where the [affidavit] says, "[McCullar] handed Officer Disher the bag of MJ Burny 1g Aromatic Potpourri (AKA Synthetic Marijuana)[?"]

A.      [Yes] .

. . .

Q.      In parentheses where it says [(AKA Synthetic Marijuana)], are those your words?

A.      [Lamancusa] would have given me that to put that in there . . . . I just called it suspected synthetic marijuana . . . .

Q.      [In the third paragraph] . . . that says [(AKA Synthetic Marijuana)], did [Lamancusa] tell you to put those words in?

A.      Again, it was very casual, our conversation.  He looked over everything and he made a few recommendations, I believe, but I don't recall exactly what they were or what I might have changed.   Again, that's every search warrant[;] the [district attorney] has to approve it.   They make recommendations. They do that.  They want the case because they're going to prosecute the case, and they want it to be proper.

Q.      So when you were discussing this last paragraph here with [Lamancusa], was it your understanding that he couldn't approve the [application] unless you made the changes he wanted?

. . .

A.    No.  He has the right to say, no, you're not filing it.  So, yes, if he recommends me to do something, I do it, as long as it's not something that's known to me to be against the law.  I mean, he is the District Attorney.  Again, this whole case, we called him for advice on what to do, if it was legal or not, first of all.  And then, secondly, the policy of the [district attorney] is that he approves the search warrant, every one of them, [drug-related].  Every one of them.  I have never filed a search warrant since [Lamancusa] has been [district attorney] that was not approved through his office . . . .

. . .

Q.    . . . [P]rior to the controlled buy, did you have a conversation with [Lamancusa] for the purpose of receiving advice as to whether the product provided by McCullar was legal?

. . .

A.    Yes.  [Lamancusa] advised us what he wanted done.  He said, we're not going to arrest [Latour].  We're going to send it all to the lab, whatever was recovered, and go from there . . . . [U]ntil it's tested by our regional laboratory, we don't know whether the product is legal or not.

. . .

Q.    Prior to writing the . . . third paragraph, did you have any discussions with [Lamancusa] about the need for testing the product from My House?

A.    Yes . . . .  [Lamancusa] advised we would have to send everything to the lab.

(ECF No. 65-4 at 12–14.)

Lamancusa described the role he played in approving the warrant application

as follows:

> Q.    . . . [D]id you approve this search warrant application?
>
> A.    I imagine I did because I noticed the box is checked.  It says, warrant application on the first page . . . .  There's—right in the middle, it says, "Warrant application approved by District Attorney."  Now, when it says District Attorney there, that does not always mean the District Attorney.  Pursuant to [the Standing Order], all search warrants involving drugs . . . have to be approved by the [district attorney's office] . . . .  [T]hese are standardized forms that we can't change.
>
> Q.    So, I'm sorry, do you recall specifically if you approved this warrant [application for My House]?
>
> A.    I don't specifically recall if I approved it.  But I will say it was approved by the [district attorney's office].  And I imagine if I was down there, I probably approved it.  I mean, just logically speaking.
>
> Q.    When you say, "down there," do you mean Ellwood City?
>
> A.    I do.

(ECF No. 65-2 at 10.)

### G.    *Securing My House pending the application for the search warrant*

While Officer McBride was finalizing the search warrant application at the police station, several other officers, including Officer Kingston, remained at My House with Latour for one and a half to two hours.  (ECF No. 67-1 at 99, 101, 105; ECF No. 70 ¶ 88.)  Officer Kingston described his interactions with Latour during this time as follows:

> Q.    Was . . . Latour in My House?

A.     Yes.  He was in there the whole time.

Q.     Did he ever try to leave?

A.     No.

Q.     Do you recall if he expressed any desire to leave?

A.     No.    In fact, I think I asked him if he wanted to leave, and he said no . . . .  [Latour] was free to leave, but he wasn't going to roam around the building either.

Q.     What do you mean by that?

A.     He could not go over to a counter and reach under a counter or anything like that.

Q.     Did someone tell him he couldn't do that?

       . . .

A.     I don't think anybody told him, but I think he just understood it.

Q.     What leads you to believe he just understood that?

A.     He just never moved from that one spot, the way I recall it.

Q.     What would you have done if he had tried to go through any of his inventory?

A.     I would have just told him that we don't really want him reaching under any counters, into any drawers, or anything like that.

Q.     And what was the reason for that?

A.     Well, obviously, we hadn't begun our search, and we did not know if there was [*sic*] any weapons in the drawers or under the counter or anything like that.

Q.    So he just stayed put; right?

A.    He did.

Q.    Where within the store did he stay put?

A.    If you walk directly into the store, straight ahead was a counter. As I recall, he pretty much stayed in that one location.

Q.    Behind the counter?

A.    Yes.

(ECF No. 67-1 at 101–03.)

### H.    The approval and execution of the search warrant

After the search warrant application was finalized, Officer McBride brought it to a magistrate, who approved it.  (ECF Nos. 65-4 at 14, 65-6.)  Officer McBride returned to My House with the search warrant and began to search the premises with the other officers.  (ECF No. 65-4 at 14.)  Lamancusa described his actions concerning the search as follows:

A.    I guess I would have either been at [My House] either after the search warrant or when the police sort of froze the scene, pending the search warrant.

. . .

Q.    Do you make any determination prior to securing the scene?

A.    I do nothing regarding the scene, the search.  That is all the police department.

. . .

Q. When you entered [My House], did you have a purpose or a goal or some intent as to entering?

A. Typically, prosecutors—I like prosecutors to go to the scene of any type of search warrant just to get a lay of the land because if there is going to be a criminal prosecution, it's a lot easier when you've actually been there. So when you're asking police officers questions, you know, if they tell you, hey, we found something, you know, under the red chair, well, then you know, hey, there was a red chair in the right-hand corner of the room. It's just merely to get a mental map of the locations being searched.

Q. You said you looked around while you were in [My House]; right?

. . .

A. I walked in. I visually looked around and then left, but I did not partake in any type of search or I didn't move anything. It's not my—it's not my search scene . . . . There's really no reason for me to be at a search warrant [scene] other than to, you know, take a look real quick and get out. I don't partake in the search . . . .

Q. So, you entered [My House], you looked around, and then you left. After you left, did you return that day?

. . .

A. . . . [N]o. I never went back . . . . [I]t was the only time I was there. I was never in his store before, nor have I been there after.

(ECF No. 65-2 at 9–10.)

During the search of My House, the police seized, *inter alia*, products labeled "MJ Burny," "Puffy," "Permagrin," "Primo," "Maeng Da Kratom,"

"VooDoo," and "Xtreme." (ECF No. 70 ¶ 54.)

## I.    *Laboratory testing of the products seized from My House*

Officer McBride submitted the products seized from My House to the Pennsylvania State Bureau of Forensic Services for laboratory analysis. (*Id.* ¶ 55.) The laboratory analysis concluded that all products seized from My House were legal. (*Id.* ¶ 56.) Latour's merchandise was returned, and he was not charged with a crime. *See* (*id.* ¶ 59.) This suit ensued.

## IV.    STANDARD OF REVIEW

In relevant part, Rule 56 provides that

> [a] party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law . . . .

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c). After discovery and upon a motion, Rule 56 requires the entry of summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and on which that party will bear the burden of proof at trial. *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23

(1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could decide it in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the [nonmoving] party in light of his burden of proof." (citing *Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322–23)).

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

In deciding a Rule 56 summary judgment motion, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences and resolve all doubts in its favor. *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001). The court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

# V.    DISCUSSION

Section 1983 provides a cause of action for the deprivation of constitutional rights by persons acting under color of state law.  *See* 42 U.S.C. § 1983.  Section 1983 is "not itself a source of substantive rights" but a "method for vindicating federal rights" conferred by the Constitution.  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  To succeed on a § 1983 claim, the plaintiff must prove that the defendant was a person acting under color of state law who caused a deprivation of his or her rights under the Constitution.  *See, e.g.*, *Siceloff v. Twp. of W. Deer*, No. 11-783, 2013 WL 3989427, at *7 (W.D. Pa. Aug. 2, 2013) (citing *Anderson v. Davila*, 125 F.3d 148, 159 (3d Cir. 1997)).

Latour's § 1983 claims against Lamancusa are based on the Fourth Amendment, which "applies to the States through the Fourteenth Amendment." *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985).  The Fourth Amendment prohibits "unreasonable" government "searches and seizures" and generally requires a warrant supported by probable cause.  U.S. CONST. amend. IV.  Lamancusa seeks judgment as a matter of law on Latour's property- and person-based Fourth Amendment claims, *i.e.*, the only claims remaining in this action.  In opposing Lamancusa's motion, Latour argues that genuine disputes of material fact exist with respect to whether Lamancusa violated his Fourth Amendment rights by (1) recklessly omitting material facts from, and reviewing and approving, the My

House search warrant application and (2) seizing his person without legal justification pending the application for the search warrant. The court addresses each of Latour's Fourth Amendment claims in turn below.

## A. *Latour's property-based Fourth Amendment claim*

In support of his motion, Lamancusa argues that there is no genuine dispute of material fact about whether he violated Latour's Fourth Amendment rights by recklessly omitting facts necessary to a finding of probable cause from the My House warrant application. The court agrees. It is undisputed that Officer McBride drafted and swore to the warrant application's veracity as the affiant.[7]

---

[7] "A [§] 1983 plaintiff who challenges the validity of a search warrant by asserting that law enforcement agents submitted a false affidavit to the issuing judicial officer" must satisfy the two-part test of *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997). Under *Franks* and *Sherwood*, the plaintiff must prove, by a preponderance of the evidence, that (1) the "affiant[,] . . . with a reckless disregard for the truth, made . . . omissions that create a falsehood in applying for a warrant," and (2) "such . . . omissions are material, or necessary, to the finding of probable cause." *Id.* (citing *Franks*, 438 U.S. at 171–72); *Franks*, 438 U.S. at 155–56 (requiring a "showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . ."). "[The] reckless [omission] whose impeachment is permitted" under *Franks* is, however, "only that of *the affiant* . . . ." *Franks*, 438 U.S. at 171 (emphasis added); *id.* at 170 ("[W]e are faced today with only the question of the integrity of the affiant's representations . . . ."); *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010) (the *Franks* test involves "determining the affiant's motivation"); *cf. United States v. Giacalone*, 853 F.2d 470, 476 (6th Cir. 1988) (*Franks* requires a showing that the statements or omissions "originated with the government affiant").

In this case, Latour points to parts of the record suggesting that the affiant—*i.e.*, Officer McBride, not Lamancusa—recklessly omitted material facts from the My House warrant application. *See* (ECF No. 66 at 10–12.) Problematically for Latour, however, it is undisputed that Officer McBride—not Lamancusa—drafted the affidavit of probable cause and swore to its veracity as the affiant. Because Lamancusa was not the affiant in this case, it is unclear whether Latour's "reckless omission"-based Fourth Amendment claim against Lamancusa is viable under *Franks* and the decisions following it. Because the parties did not brief this issue, the court declines to rule on it at this stage. In any event, Lamancusa's motion for summary judgment

Lamancusa reviewed and approved the warrant application, but there is no genuine dispute that he was required to do so under the state court's Standing Order. He is, therefore, entitled to absolute quasi-judicial immunity for this conduct. This conclusion is explained in detail below.

### 1. Whether Lamancusa is entitled to absolute immunity for reviewing and approving the warrant application

While Lamancusa did not draft or swear to the warrant application in this case, the record shows that he reviewed and approved it before Officer McBride submitted it to the magistrate, in accordance with the state court's Standing Order. Lamancusa argues—and the court agrees—that he is entitled to absolute quasi-judicial immunity for this conduct.

Absolute quasi-judicial immunity is a complete bar to a § 1983 damages claim. *See Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). The doctrine evolved from the absolute immunity judges historically enjoyed for "'any judicial act done by them within their jurisdiction.'" *Mink v. Suthers*, 482 F.3d 1244, 1261 (10th Cir. 2007) (quoting *Bradley v. Fisher*, 80 U.S. 335, 351 (1871)); *Imbler*, 424 U.S. at 423 n.20 ("It is the functional comparability of their judgments to those of the judge that has resulted in . . . prosecutors being referred to as 'quasi-judicial' officers, and their immunities being termed 'quasi-judicial' as well."). A

---

with respect to Latour's property-based Fourth Amendment claim will be granted because Lamancusa is entitled to quasi-judicial immunity, as explained in § V.A.1 of this opinion.

prosecutor is entitled to absolute immunity for "those actions that cast him [or her] in the role of an advocate initiating and presenting the government's case." *Mink*, 482 F.3d at 1262. A prosecutor is not, however, entitled to absolute immunity for "those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution." *Id.* (citing *Imbler*, 424 U.S. at 430–31; *Burns v. Reed*, 500 U.S. 478, 486, 493–94 (1991)).

In this case, Lamancusa is entitled to absolute immunity for fulfilling his judicially delegated duty to review and approve the My House search warrant application, as required by the Standing Order. The court finds *Coopshaw v. Figurski* persuasive on this point. No. 06-13246, 2008 WL 324103 (E.D. Mich. Feb. 6, 2008).

In *Coopshaw*, police officers searched the plaintiffs' home with a search warrant unsupported by probable cause. *Id.* at *1. The plaintiffs alleged Fourth Amendment § 1983 claims against the prosecutor because he "reviewed and approved" the search warrant application before the police officers submitted it to a judge. *Id.* The prosecutor asserted absolute immunity on grounds that he reviewed and approved the warrant application "[p]ursuant to [a] local district court policy" requiring "law enforcement officers seeking a search warrant [to] first have the body of the warrant reviewed by the prosecuting attorney." *Id.* at *1, *7 (internal quotation marks omitted). The district court concluded that the

prosecutor was entitled to absolute immunity "for fulfilling his judicially-delegated duty to review and to approve the search warrant." *Id.* at *7. In so holding, the court explained that

> "[a]n official is entitled to absolute quasi-judicial immunity when that official acts pursuant to a valid court order because the act of enforcing or executing a court order is intrinsically associated with a judicial proceeding." *Cooper v. Parrish*, 203 F.3d 937, 948 (6th Cir. 2000) (internal quotations omitted). "[A]bsolute quasi-judicial immunity is unlike absolute judicial immunity in that it does not derive from the discretionary nature of an official's actions. Rather, it derives from the official's *lack of discretion*: Officials must not be called upon to answer for the legality of decisions [that] they are powerless to control . . . . Denying these officials absolute immunity for their acts would make them a [lightning] rod for harassing litigation aimed at judicial orders." [*J.P. Silverton Indus. L.P. v. Sohm*, 243 F. App'x 82, 89 (6th Cir. 2007)] (unpublished) (internal citations and quotations omitted) (emphasis in original).
>
> [Here], the [state] court policy of prosecutorial review of warrant applications effectively commandeers prosecutors to assist the [state] court judge to perform a judicial function—[*i.e.*,] determining whether a warrant should issue. Prosecutors do not have discretion to refuse to follow the [state] court policy. Here, the record demonstrates that [the prosecutor] both "reviewed" and "approved" the warrant request for probable cause and determined that the warrant request was supported by probable cause . . . . [Because] the [state] court drafted [the prosecutor] to aid in its probable cause determination pursuant to a standing . . . court policy, he is shielded by quasi-judicial immunity for that act.

*Id.* at *10–11.

In this case, there is no genuine dispute that the Standing Order issued by the Lawrence County Court of Common Pleas required Lamancusa to review and approve the My House search warrant application. The Standing Order provided

that search warrants involving suspected drug-law violations "shall not hereafter be issued by any officer unless the search warrant application had the approval of an attorney for the Commonwealth." (ECF No. 65-5 (capitalization omitted).) The record establishes that Lamancusa adhered to the Standing Order in reviewing and approving the My House search warrant application. *See, e.g.*, (ECF No. 65-2 at 10.) In effect, therefore, the Standing Order "commandeer[ed]" Lamancusa "to assist" the local magistrate "to perform a judicial function," *i.e.*, "determining whether a warrant should issue" for Latour's business property. *Coopshaw*, 2008 WL 324103, at *11. Because the state court "drafted" Lamancusa "to aid in its probable cause determination pursuant to a standing . . . court policy," Lamancusa "is shielded by quasi-judicial immunity for that act." *Id.*; *cf. Mikhail v. Kahn*, 572 F. App'x 68, 71 (3d Cir. 2014) ("Individuals charged with the duty of carrying out facially valid court orders enjoy quasi-judicial absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." (citing *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 772–73 (3d Cir. 2000))).

Latour argues that the state court did not commandeer Lamancusa to review and approve the warrant application because Lamancusa's predecessor "*elected*" to file the certification leading to the Standing Order's issuance under Pennsylvania Rule of Criminal Procedure 202. (ECF No. 66 at 4–5 (emphasis in original).) Latour argues that Rule 202 "provides an option for district attorneys—not

[Pennsylvania] courts—to require" prosecutorial approval of warrant applications. (ECF No. 70 ¶ 32.) In response, Lamancusa argues that "there is no genuine dispute that there was a state court order in place," *i.e.*, the Standing Order, "requiring [prosecutorial] review" of warrant applications in cases involving drug-law violations. (ECF No. 69 at 2.) For the reasons that follow, the court agrees with Lamancusa.

The Pennsylvania Supreme Court promulgates the Pennsylvania Rules of Criminal Procedure. *Commonwealth v. Lockridge*, 810 A.2d 1191, 1194 & n.5 (Pa. 2002) (citing PA. CONST. art. V, § 10(c)); *id.* at 1195 ("[T]he [Pennsylvania constitution's] grant to [the Pennsylvania Supreme] Court of rule-making authority is exclusive." (citing *In re 42 Pa. C.S. § 1703*, 394 A.2d 444, 449 (Pa. 1978))). Through Rule 202, the Pennsylvania Supreme Court requires Pennsylvania common pleas courts to provide district attorneys the option to elect to approve search warrant applications before they are submitted by law enforcement to a neutral magistrate. That rule provides that

> [t]he district attorney of any county may require that search warrant applications filed in the county have the approval of an attorney for the Commonwealth prior to filing . . . .

PA. R. CRIM. P. 202(a). To exercise the option Rule 202 provides, district attorneys

> shall file a certification with the court of common pleas . . . specify[ing] the circumstances in which search warrant applications shall require prior approval and . . . the date such procedure is to become effective . . . .

PA. R. CRIM. P. 202(b). Once a certification is filed with the common pleas court, Rule 202 requires the state court to "thereupon promulgate a local rule . . . setting forth the circumstances specified in the certification." *Id.*

In this case, the Lawrence County Court of Common Pleas issued the Standing Order "upon review of the . . . Certification" filed by one of Lamancusa's predecessors "pursuant to [Rule] 202." (ECF No. 65-5.) Contrary to Latour's assertions, therefore, *the state court*—not the district attorney's office— "promulgate[d] [the] local rule" (*i.e.*, the Standing Order) requiring district-attorney approval of drug-related warrant applications before their submission by law enforcement, in accordance with Rule 202. *See* PA. R. CRIM. P. 202(b); (ECF No. 65-5.) "A court order is a court order," *United States v. Albrecht*, No. 80-1590, 1985 WL 2400, at *6 (N.D. Ill. Aug. 23, 1985), and there is no genuine dispute that the Standing Order required Lamancusa to review and approve the My House warrant application before its submission to a neutral magistrate. Nothing in the records shows that Lamancusa had "discretion to refuse to follow" the Standing Order in this case, as Latour submits.

Finally, Latour argues that Lamancusa's approval of the My House warrant application was discretionary because *he* had the power to withdraw the Standing Order at any time under Rule 202. (ECF No. 66 at 4–5.) The court disagrees. First, Latour mischaracterizes Rule 202. That rule reposes in the state courts alone

the power to withdraw their own local rules, including the Standing Order. In relevant part, a comment to a related Pennsylvania Rule of Criminal Procedure cited in Rule 202 states that

> [t]he district attorney (or a successor district attorney) may withdraw the requirement of prior approval [of a warrant application] . . . by filing a notice of withdrawal with the court of common pleas. In such event, *the court of common pleas*[—*i.e.*, not the district attorney's office—]must rescind the local rule.

PA. R. CRIM. P. 507 cmt.[8] (emphasis added). There is no evidence in the record (1) that Lamancusa filed such a notice requesting that the common pleas court withdraw its Standing Order, or (2) that the common pleas court entered an order "rescinding" the Standing Order before Lamancusa approved the My House warrant application. *See id.* In other words, there is no genuine dispute that the Standing Order was in effect at all times relevant to this case and Lamancusa adhered to it in reviewing and approving the My House warrant application. For these reasons, Lamancusa is entitled to absolute immunity for this conduct. *See Coopshaw*, 2008 WL 324103, at *10–11 ("'[A]n official is entitled to absolute quasi-judicial immunity when that official acts pursuant to a valid court order because the act of enforcing or executing a court order is intrinsically associated with a judicial proceeding.'" (quoting *Cooper*, 203 F.3d at 948)); *cf. Mikhail*, 572

---

[8] "Although the Comments are not part of the [Pennsylvania] Rules [of Criminal Procedure] and have not been officially adopted or promulgated by [the Pennsylvania Supreme Court], . . . a court may rely on the Comments to construe and apply the Rules." *Lockridge*, 810 A.2d at 1196.

F. App'x at 71.[9]

[9] Like the court in *Coopshaw*, this court notes that "this would be a different case if the [state] court did not require prosecutorial review of warrant applications" under the Standing Order. 2008 WL 324103, at *11 n.4 (emphasis added).

In *Burns*, the United States Supreme Court held that "advising the police in the investigative phase of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process,' . . . that it qualifies for absolute immunity." 500 U.S. at 493 (quoting *Imbler*, 424 U.S. at 430); *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993) ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). Unlike this case, however, *Reed* and *Buckley* did not involve a state-court order *requiring* a prosecutor to review and approve an affidavit of probable cause.

Applying *Burns* and *Buckley*, the United States Courts of Appeals for the Tenth and Ninth Circuits held that qualified—not absolute—immunity extends to a prosecutor's provision of legal advice to law enforcement officers before the establishment of probable cause. *Mink*, 482 F.3d at 1262 ("Absolute immunity . . . does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution."); *KRL v. Moore*, 384 F.3d 1105, 1114 (9th Cir. 2004) ("[B]ecause probable cause had not been established, . . . the prosecutors did not serve as advocates in reviewing and approving the investigatory search warrant."). Like *Reed* and *Buckley*, however, *Mink* and *KRL* did not involve a state-court order *requiring* a prosecutor to review and approve an affidavit of probable cause, like this case does.

*KRL* is distinguishable from this case without difficulty. There, prosecutors reviewed and approved a search warrant on their own without a court order or government directive of any kind. 384 F.3d at 1108–10.

*Mink* merits further discussion. There, a Colorado statute "*allowed*" law enforcement officers to "submit [a warrant] affidavit to the office of the district attorney for legal review." 482 F.3d at 1249 (citing COLO. REV. STAT. § 20-1-106.1)) (emphasis added). That statute required district attorneys to "'render . . . legal advice to peace officers, *upon the request of such officers* or of the court, pertaining to the preparation and review of [warrant] affidavits . . . .'" *Id.* at 1263 (quoting § 20-1-106.1)) (emphasis added). At the request of *the detective*—not of the state court—the prosecutor in *Mink* reviewed and approved the warrant affidavit in issue. *Id.* at 1249. The court of appeals rejected the prosecutor's argument that the statute entitled her to absolute immunity. *Id.* at 1263 ("[A] state *statute* . . . cannot create [absolute] immunity from a federal civil rights claim where the functional analysis suggests otherwise . . . . [W]e look to what the attorney did—she provided legal advice—and not to what state law requires." (emphasis added)).

*Mink*'s analysis does not apply to this case. The state statute in *Mink* enacted by the legislature requiring district attorneys to review and approve warrant affidavits *at the request* of law enforcement officers is different from the Standing Order in this case issued by the state trial court (under a procedural rule promulgated by the state high court) *requiring* district attorneys to review and approve all drug-related warrant affidavits. Unlike an official act in accordance with a state statute, an official act "'pursuant to a valid state court order'" is entitled to quasi-judicial immunity "'because the act of enforcing or executing a court order is intrinsically associated with a judicial proceeding.'" *Coopshaw*, 2008 WL 324103, at *10–11 (quoting *Cooper*, 203

### B.    Latour's person-based Fourth Amendment claim

In support of his motion, Lamancusa argues that there is no genuine dispute of material fact that he did not detain Latour without lawful justification in My House pending the approval of the search warrant application.  The court disagrees.  First, if Latour's testimony is found credible, a reasonable jury could find that Lamancusa ordered Latour "seized" under the Fourth Amendment.  Second, accepting Latour's account that Lamancusa ordered him seized, a reasonable jury could find that Lamancusa did not have probable cause to do so.  Summary judgment cannot be granted on this claim because there are credibility issues a jury must resolve.   These conclusions are explained in detail below.

To bring a successful Fourth Amendment false-arrest claim under § 1983, the plaintiff must prove by a preponderance of the evidence that (1) a seizure occurred, (2) without probable cause.  *See Brown v. Makofka*, — F. App'x —, No. 15-1537, 2016 WL 1056064, at *3 (3d Cir. Mar. 17, 2016) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995)); *Brockington v. City of Phila.*, 354 F. Supp. 2d 563, 568 (E.D. Pa. 2005) ("An 'arrest without probable cause is a

---

F.3d at 948); *cf. Mikhail*, 572 F. App'x at 71; *McArdle v. Tronetti*, 961 F.2d 1083, 1085 (3d Cir. 1992) (absolute immunity applied to a prison physician who prepared an inmate evaluation at a judge's request because he was "functioning as an arm of the court" and "[a]s such, he was an integral part of the judicial process").  For these reasons, *Mink* is distinguishable from this case, and Lamancusa is entitled to absolute immunity for reviewing and approving the My House warrant application, in accordance with the Standing Order.

constitutional violation actionable under [§] 1983.'" (quoting *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978))).

### 1. Whether Lamancusa "seized" Latour

Under the Fourth Amendment, "[a] seizure of the person . . . occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he [or she] was not at liberty to ignore the police presence and go about his [or her] business.'" *Kaupp v. Texas*, 538 U.S. 626, 629–30 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)); *see Brendlin v. California*, 551 U.S. 249, 255 (2007) (same). "'[E]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave,' includ[e] 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Kaupp*, 538 U.S. at 629–30 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)); *see California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("[A seizure] requires *either* physical force . . . *or,* where that is absent, *submission* to the assertion of authority." (emphasis in original)).

In this case, the record reflects a genuine dispute of material fact about whether Lamancusa ordered Latour "seized"—a point Lamancusa appears to

concede in his motion. *See* (ECF No. 63 at 1 ("[T]here is a dispute [about] whether [Latour] was detained . . . at [Lamancusa's] direction . . . .").)

According to Latour, Lamancusa entered My House with several other officers directly after the controlled purchase and ordered that Latour be detained pending the application for the search warrant. (ECF No. 65-1 at 7 ("[Lamancusa said,] this is a head shop, everything in here is illegal. He said, pack it up, and, basically speaking, Mr. Latour is to be retained [*sic*] until we get a search warrant, and if he gives you a hard time, put him in cuffs . . . ."[10]).) After this encounter, there is no dispute that Latour did not attempt to move from behind the counter and was precluded from "reaching under a counter or anything like that" by the officers who remained in My House after the controlled purchase. (ECF No. 67-1 at 101–03.)

---

[10] In resolving this summary judgment motion, the court considers Latour's deposition testimony recounting Lamancusa's out-of-court statements for their truth because they are not hearsay; they are admissions by a party opponent (*i.e.*, Lamancusa) offered against him. *See* FED. R. EVID. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and . . . was made by the party in an individual . . . capacity[.]"); *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("'[H]earsay statements can be considered on a motion for summary judgment if they are capable of admission at trial.'" (quoting *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000))).

Lamancusa argues that Latour's account of his interaction with Lamancusa in My House is "not corroborated by any other witness or evidence of record." (ECF No. 63 at 11–12.) This is irrelevant: The court "do[es] not engage in credibility determinations at the summary judgment stage." *Dow Chem. Canada, Inc. v. HRD Corp.*, 587 F. App'x 741, 746 (3d Cir. 2014) (quoting *Simpson*, 142 F.3d at 643 n.3).

In contrast, Lamancusa, Officer McBride, and Officer Kingston denied Latour's allegation that "Lamancusa instructed the . . . officers to detain Latour inside My House until he returned with a search warrant." (ECF Nos. 50 ¶ 101, 51 ¶ 101 (denying Latour's allegation at ECF No. 38 ¶ 101).) Lamancusa stated it would have been "extraordinary" for him to be present for the controlled purchase. (ECF No. 65-2 at 6–7.) Officer McBride "believed" Lamancusa returned to the police station directly after the controlled purchase and did not recall Lamancusa speaking to Latour. (ECF No. 65-4 at 11.)

Viewing the record in Latour's favor, the court concludes that a reasonable jury could find that Lamancusa's alleged conduct "'would have communicated to a reasonable person'" in Latour's position "'that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp*, 538 U.S. at 629–30 (quoting *Bostick*, 501 U.S. at 437). Several officers entered My House after the controlled purchase. (ECF No. 67-1 at 101–03); *Kaupp*, 538 U.S. at 629–30 (observing that "'the threatening presence of several officers'" may indicate a seizure (quoting *Mendenhall*, 446 U.S. at 554)). After entering My House, Lamancusa allegedly stated: "everything in here is illegal"; Latour "[is] to be retained [*sic*] until we get a search warrant"; and "if [Latour] gives you [*i.e.*, the police officers] a hard time, put him in cuffs." (ECF No. 65-1 at 7); *Kaupp*, 538 U.S. at 629–30 (observing that "'the use of language . . . indicating that compliance with the . . . request might be

compelled'" is evidence of a seizure (quoting *Mendenhall*, 446 U.S. at 554)). After hearing these statements, Latour did not move from the behind the counter or attempt to leave My House for one and a half to two hours. (ECF No. 67-1 at 101–03; ECF No. 70 ¶ 88); *cf. Hodari D.*, 499 U.S. at 626 (observing that where physical force is absent, the "*submission* to the assertion of [police] authority" is evidence of a seizure (emphasis in original)). If Latour's testimony is found credible, a reasonable jury could find that Lamancusa ordered Latour's "seizure" under the Fourth Amendment, creating a genuine dispute of material fact for trial.

### 2.      *Whether Lamancusa had probable cause to order Latour seized*

A seizure "'without probable cause[11] is a constitutional violation actionable under [§] 1983'" and the Fourth Amendment. *See Brockington*, 354 F. Supp. 2d at

---

[11]      In his motion, Lamancusa assumes without explanation that only "reasonable suspicion"—not the higher standard of probable cause—was required to seize Latour in this case, relying on *Terry v. Ohio*, 392 U.S. 1 (1968). (ECF No. 63 at 11.) The court disagrees. The facts of this case do not fall within the *Terry*-stop framework.

Under *Terry*, law enforcement officials can "stop and briefly detain a person for investigative purposes if the [official] has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). "The *Terry* stop is a . . . minimal intrusion, simply allowing the officer to briefly investigate further." *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000). *Terry* does not apply to this case for two reasons.

First, there was no "stop" to which *Terry* might apply in this case. The court is unaware of, and Lamancusa fails to point to, any decision in which *Terry* applied outside the context of law enforcement officials *stopping* a person (1) on foot or (2) in that person's vehicle, on the basis of reasonable suspicion of criminal activity. *Terry* itself involved a police officer stopping and frisking individuals on the street after observing them engage in suspicious activity. *Terry*, 392 U.S. at 4–8; *see Rodriguez v. United States*, 135 S. Ct. 1609 (2015) (applying *Terry* to a traffic encounter). It is, therefore, doubtful that *Terry* applies to the circumstances of this case, in which a prosecutor allegedly entered a person's business uninvited and ordered him detained by police officers pending the approval (or, possibly, the disapproval) of a search warrant

568 (quoting *Patzig*, 577 F.2d at 848). "[T]o insulate a defendant from liability," the court "need find only that '[p]robable cause . . . exist[ed] as to any offense that could be charged under the circumstances.'" *Johnson v. Knorr*, 477 F.3d 75, 84–85 (3d Cir. 2007) (quoting *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994)). "Probable cause to arrest requires more than mere suspicion; however, it does not require that the [official] have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482–83 (3d Cir. 1995) (citing *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984)). "Rather, probable cause to arrest exists when the facts and circumstances within the arresting [official's] knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Id.* (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979); *United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990)).

Accepting Latour's account that Lamancusa ordered him "seized," the record in this case reflects a genuine dispute of material fact about whether

application. Extending *Terry* to these circumstances, where no investigative "stop" occurred, would eviscerate *Terry*'s purpose as a narrow exception to the Fourth Amendment's general requirement of probable cause for a government seizure.

Second, even if a "stop" occurred in this case under *Terry*, it was not "brief." *Wardlow*, 528 U.S. at 126. Latour was detained in My House while McBride pursued a search warrant for one and a half to two hours. (ECF No. 70 ¶ 88). A one-and-a-half to two-hour encounter with law enforcement officials is not "brief" under *Terry*. *See United States v. Place*, 462 U.S. 696, 709 (1983) (holding luggage over ninety minutes was a prolonged seizure that exceeded the limits of an investigative stop under *Terry*); *Mawson v. Pittston Police Dep't*, 145 F. Supp. 3d 363, 378 (M.D. Pa. 2015) ("[A]n *hour long* detention . . . is not a brief, momentary seizure." (emphasis in original)). For these reasons, this case does not fall within the *Terry*-stop framework. Probable cause is the appropriate standard, not reasonable suspicion.

Lamancusa had probable cause to do so. Latour adduced evidence from which a reasonable jury could conclude that Lamancusa ordered Latour's seizure notwithstanding that he knew (1) offsite laboratory testing was *required* to determine if Latour's synthetic marijuana was illegal and (2) the two samples of Latour's synthetic marijuana in the officers' possession had not yet been tested.[12]

During his deposition, Officer McBride provided the following:

> Q.    . . . [P]rior to the controlled buy, did you have a conversation with [Lamancusa] for the purpose of receiving advice as to whether the product provided by McCullar was legal?
>
> . . .
>
> A.    Yes. [Lamancusa] advised us what he wanted done. He said, we're not going to arrest [Latour]. *We're going to send it all to the lab, whatever was recovered, and go from there . . . . [U]ntil it's tested by our regional laboratory, we don't know whether the product is legal or not.*
>
> . . .
>
> Q.    Prior to writing the . . . third paragraph, did you have any discussions with [Lamancusa] about the need for testing the product from My House?
>
> A.    Yes . . . . [Lamancusa] advised *we would have to send everything to the lab.*[13]

---

[12]    As explained previously, McCullar provided the officers two samples of synthetic marijuana from My House before Latour was allegedly seized: (1) the product McCullar brought to Officer McBride the morning of August 10, 2012, and (2) the product McCullar bought from My House during the control purchase later that day.

[13]    At the summary judgment stage, these statements are not hearsay and may be considered in resolving this motion for the reasons set forth in footnote 10 (discussing admissions by a party opponent).

(ECF No. 65-4 at 12–14 (emphasis added)); *see* (ECF No. 65-2 at 13 (Lamancusa stating, "[U]nfortunately at the time, synthetic marijuana, there were no test kits available . . . .").)  While Lamancusa did not require evidence sufficient to prove "beyond a reasonable doubt" that Latour possessed and sold illegal synthetic marijuana to order his seizure, he required "more than [a] mere suspicion" of illegal activity to do so.  *Orsatti*, 71 F.3d at 482–83.  Under the unique circumstances of this case, it is undisputed that only offsite laboratory testing could confirm or dispel the "mere suspicion" that Latour's synthetic marijuana was illegal.[14]  A reasonable jury could conclude, therefore, that no "reasonable person" with Lamancusa's knowledge about the *necessity* of offsite laboratory testing could "believe that an offense [was] or [was] being committed by" Latour where no such testing had taken place.  *See id.*; *cf. Gates*, 462 U.S. at 238–39 (requiring evidence of a "*fair probability*," not a fifty/fifty suspicion, of illegal activity to establish probable cause (emphasis added)); *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion) ("[Law enforcement officials] may [not] seek to verify [mere] suspicions by means that approach the conditions of arrest.").  In these circumstances, a genuine dispute of material fact exists about whether Lamancusa

---

[14]  The record shows that Lamancusa told the officers that Latour was not to be arrested until the search of My House was over and his products were seized and tested in an offsite laboratory.  *See* (ECF No. 65-4 at 12–14.)  This is consistent with the understanding that offsite laboratory testing was necessary to support probable cause where none of the officers had training to distinguish legal from illegal synthetic marijuana.  *See* (ECF No. 70 ¶¶ 13, 25, 38.)

had probable cause to order Latour's seizure. Lamancusa is not entitled to summary judgment on this claim.[15]

## VI. CONCLUSION

For the reasons explained in this opinion, the court will grant in part and deny in part Lamancusa's Rule 56 motion for summary judgment. (ECF No. 62.) Lamancusa's motion will be granted with respect to Latour's property-based

---

[15] Somewhat sporadically in his motion and supporting brief, Lamancusa argues that he is entitled to qualified immunity with respect to Latour's Fourth Amendment § 1983 claims.

The court need not—and therefore declines to—address whether Lamancusa is entitled to qualified immunity from Latour's property-based Fourth Amendment claim, for which Lamancusa is entitled to summary judgment on other grounds. *See supra*, § V.A.

It is unclear whether Lamancusa seeks qualified immunity with respect to Latour's person-based Fourth Amendment claim and, if so, on what grounds. In his motion, he does not distinguish the claims for which he seeks qualified immunity, asserting broadly and without citation that "[t]he precedent at the time did not require that laboratory analysis occur pre-seizure." (ECF No. 62 ¶¶ 10–11.) Qualified immunity from Latour's person-based (or property-based) claim is not requested in Lamancusa's proposed order. *See* (ECF No. 62-1.) Similarly, in his supporting brief, Lamancusa discusses qualified immunity from Latour's *property*-based claim in detail but devotes only one conclusory sentence to qualified immunity from Latour's *person*-based claim. (ECF No. 63 at 17 ("*By the same token*, even if reasonable minds could differ as to [Latour's] . . . allegation that he was detained, detaining him under the circumstances would not be so unreasonable as to fall outside of the protections of qualified immunity." (emphasis added)).) In his brief, Lamancusa cites only to authorities addressing qualified immunity for officials submitting search warrant applications to seize *property*. (ECF No. 63 at 14–17 (citing, for example, *United States v. Riley*, No. 12-478, 2014 WL 537013 (D. Nev. Feb. 7, 2014) (denying a motion in a criminal action for a *Franks* hearing to challenge the affiants' statements and omissions in a search warrant affidavit for "'fake pot'"), and *United States v. Stephens*, No. 14-1, 2014 WL 4955713 (W.D. Va. Oct. 1, 2014) (denying a motion to suppress evidence in a criminal action in which the defendants were charged with "trafficking in controlled substance analogues" and argued that the search warrant affidavits were not supported by probable cause)).)

Lamancusa does not explain, and the court cannot discern from his filings, why and in what manner, if any, authorities dealing with police officers seeking search warrants for property apply "[b]y the same token" to this case, which involves a prosecutor allegedly ordering the warrantless seizure of an individual while police officers pursue a search warrant. In the absence of an explicit request for qualified immunity with respect to this claim and sufficient briefing on the issue, the court declines to rule at this time on whether Lamancusa is entitled to qualified immunity from Latour's person-based Fourth Amendment claim under § 1983.

Fourth Amendment claim.  Genuine disputes of material fact, however, preclude the entry of summary judgment for Lamancusa on Latour's person-based Fourth Amendment claim.  His motion will be denied with respect to that claim.

An appropriate order follows.


**DATED**:        July 26, 2016

**/s/ JOY FLOWERS CONTI**
Joy Flowers Conti
Chief United States District Judge
